IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE, RED IN COLOR, WHICH WAS FOUND ON THE FRONT PASSENGER SIDE FLOOR OF THE AUDI A7 QUATTRO OPERATED BY **STEPHON TERRELL LEWIS** AND SEIZED BY LAW ENFORCEMENT ON FEBRUARY 2, 2022. THE DEVICE IS CURRENTLY LOCATED AT THE HOMELAND SECURITY INVESTIGATIONS COLUMBUS, OHIO SECURE EVIDENCE VAULT

Case No. 2:22·mj·84

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Homeland Security Investigations (HSI) Special Agent (SA) Clark S. Powers (your affiant), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

Your affiant submits this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—four cellular telephones—which are currently in law enforcement possession, and the extractions from those cellular telephones of electronically stored information described in Attachment B.

1. Your affiant has been employed by HSI since December 2016, having been assigned to our Sells, Arizona office. During that time, your affiant was assigned to the Sells Border Enforcement and Security Task Force (BEST), which focused on human, narcotics, bulk cash, and weapon smuggling occurring between Ports of Entry (POE) and the Phoenix, Arizona metropolitan area. Beginning in October 2020, your affiant was assigned to the HSI Columbus, Ohio office, as a participating member of the Central Ohio High Intensity Drug Trafficking Area (HIDTA) multi-agency task force. Your affiant gained experience through a Bachelor of Arts

Degree in Criminal Justice in 2007, completion of the Federal Criminal Investigator Training Program (CITP) and completion of the HSI Special Agent Training Academy in 2017. During CITP and the HSI Academy training, your affiant was instructed in all phases of criminal investigation such as: Criminal Law, Search and Seizure, Field Enforcement Techniques, Firearms Proficiency, and Interviewing and Evidence. Your affiant is responsible for enforcing federal criminal statutes including, but not limited to, controlled substance violations, pursuant to 21 U.S.C. §§ 841 and 846.

2. Through both training and experience, your affiant is familiar with narcotics traffickers' methods of operation including the importation, distribution, and transportation of illegal drugs, the collection of money, and money laundering. Your affiant has executed, or participated in the execution of, numerous search warrants and seized evidence of these violations.

3. Your affiant has experience in conducting criminal investigations of violations of Title 21 (controlled substance statutes) and Title 19 (customs statutes) of the United States Code. Based on your affiant's experience, training, and conversations with HSI Special Agents, DEA Special Agents, United States Postal Inspectors, and HSI Task Force Officers, your affiant has observed and learned that narcotics trafficking organizations utilize several methods to insulate their illegal activities from law enforcement detection. These methods are common to major narcotics trafficking organizations and vary in levels of sophistication.

4. Through training and experience, your affiant knows drug trafficking organizations commonly use electronic devices, cellular telephones, and radio telephones in an attempt to maintain secure communications between network members and customers. They use these devices during the commission of their criminal activity and the events preceding and following such activity for the following reasons:

a) They use cellular telephones to arrange, coordinate, and monitor smuggling activities including communicating with other smugglers, arrangers, and other transporters/drivers to coordinate narcotics loads. They also use cellular telephones to communicate with these same individuals during counter-surveillance activities, and to warn co-conspirators of the presence of law enforcement or other obstacles to their smuggling plans.

b) They use cellular telephones to contact financial institutions where they launder their proceeds or receive monies for payment for their roles in the scheme, as well as to contact individuals who sell/rent real estate, vehicles, or other facilities the smuggler uses to conduct illegal activities.

c) They use all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communications, direct dial, push-to-talk, email, internet access, communication applications, encrypted communications, photo and video images, and contact lists containing information about their criminal associates to accomplish their illicit activities.

d) They use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement.

5. Your affiant is investigating an organized group of individuals, some known and unknown currently, including **Stephon Terrell LEWIS (hereafter referred to as LEWIS)**. The organization is suspected of conspiring to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

6. The facts in this affidavit are based upon your affiant's personal observations, training and experience, and information obtained from other agents and witnesses. This

3

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all your affiant's knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 21 U.S.C. §§ 846 (conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine) has been committed by **LEWIS**. There is also probable cause to believe evidence relating to the above criminal violation under investigation, including the users of the cellular telephones and information about both known and unknown co-conspirators, will be stored on, or tied to the cellular telephones. There is probable cause to believe that the use of the investigative technique described by the warrant will result in investigators learning this information.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The property to be searched is an Apple iPhone, red in color, which was found in the possession of **Stephon Terrell LEWIS,** and seized by law enforcement on February 2, 2022. The device (hereafter referred to as **"Phone 3"**) is currently located at the Homeland Security Investigations (HSI) Columbus, Ohio secure evidence vault.

9. The applied-for warrant would authorize the forensic examination of **Phone 3** for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

10. U.S. Customs and Border Protection Officers (CBPO) and HSI SAs in St. Thomas, USVI identified U.S. Postal Service (USPS) parcels found to contain suspected cocaine during an outbound mail inspection on January 29, 2022. The parcels originated from a sender listed as Sam SMITH with an address of 200 North 21st Street, Columbus, Ohio 43203 and were scheduled to be delivered to Tony JOHNS at 137 South Wheatland Avenue, Columbus, Ohio 43204. The

4

Gemini Narcotics Detection Device was used to field test the suspected narcotics found in each parcel, yielding positive results for cocaine. Approximately 10.3 kilograms of cocaine were seized from the parcels. On January 31, 2022, HSI USVI SAs and U.S. Postal Inspector Eric Oram notified your affiant that a Columbus based phone number, 614-432-2417, was tracking the location of the parcels and was set up to receive text message alerts for shipment status updates. HSI USVI SAs identified a Columbus, Ohio based suspect, later identified as Stephon Terrell LEWIS. SAs learned that LEWIS booked travel from St. Thomas, USVI to Columbus, Ohio on January 31, 2022. The parcels utilized the following USPS tracking numbers:

Target Parcel 1: USPS Priority Mail Tracking Number 9505 5111 4093 2029 2281 90

Target Parcel 2: USPS Priority Mail Tracking Number 9505 5111 4093 2029 2282 06

Target Parcel 3: USPS Priority Mail Tracking Number 9505 5111 4093 2029 2281 76

Target Parcel 4: USPS Priority Mail Tracking Number 9505 5111 4093 2029 2283 13

Target Parcel 5: USPS Priority Mail Tracking Number 9505 5111 4093 2029 2281 83

11. On February 1, 2022, your affiant obtained five (5) tracker warrants for the USPS parcels. Due to the presence of five (5) USPS parcels and other safety concerns, HSI Columbus SAs removed all narcotics from the originally shipped USPS boxes and replaced them with GPS enabled tracking devices and sham cocaine in order to prevent the delivery of controlled substances and subsequent distribution to multiple individuals or locations.

12. On February 2, 2022, SAs and Task Force Officers (TFO) from HSI Columbus, the HSI Detroit Special Response Team (SRT), the Drug Enforcement Administration (DEA) Columbus Division Office (CDO), the U.S. Postal Inspection Service (USPIS), and the Franklin County Sheriff's Office (FCSO) conducted a controlled delivery of sham cocaine to 137 South Wheatland Avenue, Columbus, Ohio 43204. The purpose of the operation was to identify

5

individuals involved in the drug distribution conspiracy, of U.S. Postal Service (USPS) parcels found to contain cocaine, which were seized by Customs and Border Protection Officers (CBPO) in St. Thomas, U.S. Virgin Islands (USVI) on January 29, 2022. Additionally, HSI was prepared to execute a Federal Anticipatory Search Warrant on 137 S. Wheatland Ave. once the sham cocaine substances, contained within USPS parcels, was accepted, and carried into the residence. It should be noted, sham cocaine was utilized in place of the controlled substances for officer safety and to prevent the loss of actual controlled substances during the operation.

13. On February 2, 2022, at approximately 8:02 a.m., the five (5) USPS parcels containing sham cocaine, tracking devices, and package beacons which alert agents if the parcels are opened, were activated, sealed, and turned over to U.S. Postal Inspector Justin Koble for controlled delivery to 137 S. Wheatland Ave, Columbus, OH 43204. At approximately 8:23 a.m., SAs and TFOs with DEA and HSI established surveillance in an area surrounding 137 S. Wheatland Ave. HSI TFO Michael Shippitka established a physical surveillance position near the front door of the residence in order to maintain constant visual surveillance of the parcels upon delivery, and the actions of individual(s) arriving to retrieve them. In addition to the physical surveillance, a video surveillance platform was deployed in the area to record the events at the residence for documentation purposes.

14. At approximately 9:03 a.m., Inspector Koble arrived in front of 137 S. Wheatland Ave. in a USPS delivery vehicle. Inspector Koble placed the five (5) parcels on the front porch of the residence and knocked on the door. Inspector Koble notified investigators after leaving the residence that the front door did not have a doorknob or lock, indicating the residence was likely unoccupied. At approximately 9:34 a.m., a black Audi four door sedan bearing Ohio license plate JDC5899 arrived and parked in front of 137 S. Wheatland Ave. On January 31, 2022, Agents

6

observed Stephon Terrell LEWIS departing the John Glenn International Airport in a taxi. The taxi dropped LEWIS off in an alley behind a residence located at 99 Winner Avenue. Shortly after, the same black Audi bearing Ohio license plate JDC5899 was observed leaving the area.

15. Less than a minute after arriving at the residence, a black male matching the description of LEWIS exited the black Audi (hereafter referred to as Vehicle 1) and retrieved all five (5) parcels from the front porch. The subject, later identified as LEWIS, was observed wearing blue jeans, black sneakers, and a black coat. LEWIS opened the rear driver's side door of Vehicle 1, placed the parcels in the rear passenger compartment, and proceeded to leave the area of 137 S. Wheatland Ave.

16. After retrieving the parcels and leaving the area, deputies with the Franklin County Sheriff's Office attempted to conduct a traffic stop on the vehicle. At approximately 9:37 a.m., JDC5899 failed to yield to the marked cruisers and fled the area through the surrounding neighborhoods north of West Broad Street. Special Agents and TFOs established mobile surveillance in an effort to monitor the vehicle's location. Vehicle 1 attempted to evade law enforcement for approximately ten minutes. After making several evasive maneuvers, including driving the wrong direction on one-way streets, Vehicle 1 temporarily evaded police and visual was lost near Ridge Avenue and North Hague Avenue. Surveillance units surrounded the area and began searching the area for Vehicle 1.

17. HSI Detroit SRT personnel driving the Bearcat armored vehicle observed JDC5899 several blocks ahead of them on North Hague Avenue as it came to a railroad crossing travelling northbound. Vehicle 1 was observed making a U-turn in the direction of the Bearcat before turning onto a side street. Vehicle 1 also nearly caused high speed collisions with multiple law enforcement vehicle. The Bearcat continued northbound in the opposite lane (no vehicles were

oncoming due to the railroad crossing ahead) in order to catch up to the black Audi. As the Bearcat continued northbound, Vehicle 1 made a sharp, right-hand turn, at a high rate of speed, from Elliott Avenue onto North Hague Avenue. Vehicle 1 collided with the front driver's side of the Bearcat, causing Vehicle 1 to spin out of control into a residential front yard. Vehicle 1 smashed a fence, mailbox, and collided with a parked vehicle in the resultant crash. LEWIS then jumped out of Vehicle 1 and ran a short distance before surrendering to HSI SRT personnel near 443 North Hague Avenue, Columbus, Ohio 43204. It is estimated that LEWIS was observed driving on residential roads at speeds reaching approximately 80 to 90 miles per hour, while operating Vehicle 1.

18. At approximately 9:45 a.m., HSI SA Shadi Elreda placed LEWIS in handcuffs, followed by SA Chad Schofield conducting a search incident to arrest for any weapons that LEWIS may have been carrying. A black Apple iPhone (hereafter referred to as **Phone 1**) was found in the possession of LEWIS at the time of his arrest. HSI SRT agents turned LEWIS over to FCSO deputies for transport to the U.S. Marshals Service (USMS).

19. LEWIS was walked to medical personnel on scene for medical screening prior to being placed in custody. Medical personnel on scene found no injuries and returned LEWIS to the custody of FCSO. After LEWIS was placed into a marked FCSO cruiser, HSI SA Powers, DEA SA James Rose, and DEA TFO Jonathan Baer attempted to conduct a custodial interview of LEWIS. SA Powers read LEWIS his Miranda rights. LEWIS stated he understood his Miranda rights and invoked his right to consult an attorney. The interview was concluded at that time.

20. HSI Columbus SAs and TFOs conducted a probable cause search of Vehicle 1 once the scene was safe and secure. During the initial search, Agents determined that the GPS tracked USPS parcels containing sham cocaine were not present in Vehicle 1. USPIS Koble was monitoring the location of the parcels during the mobile surveillance. USPIS Koble determined

8

that the parcels had been discarded in an alley near Ridge Avenue and North Hague Avenue. USPIS Koble located the discarded parcels in a trash can near the aforementioned intersection. USPIS Koble took photographs of the parcels in place and searched for additional contraband and evidence in the trash can before retrieving the USPS parcels.

21. HSI SA Chadwick Van Sickle searched the alley where the USPS parcels were located and identified a security camera affixed near a second story window of a residence located at 2750 Ridge Avenue, Columbus, Ohio. The camera looked southbound into the alley where the USPS parcels were recovered. SA Van Sickle spoke with the homeowner, who identified himself as Tim Scott Smith Junior Randolph (hereafter referred to as Randolph). SA Van Sickle reviewed the footage and observed LEWIS and Vehicle 1 briefly stop in the alley near a Columbus city trash can, retrieve the parcels, open a trash can lid, and discard the parcels into the trash can, eventually leaving the area. In the video, the front and side profile of Vehicle 1 can be observed to match Vehicle 1 driven by LEWIS. Randolph provided a digital copy of the footage to SA Van Sickle.

22. During the search of Vehicle 1, Agents located the same silver rolling suitcase and white cardboard box that were observed being carried by LEWIS at the John Glenn International Airport on January 31, 2022. While searching the inside of the suitcase, Agents located vacuum sealable bags which are often used to package controlled substances for distribution. Agents also located a partially used roll of silver/gray duct tape in the trunk of the vehicle, which matched the type of packaging materials used to package the cocaine seized from the USPS parcels by CBP. Agents further located a white Apple iPhone (hereafter referred to as **Phone 2**) in the driver's side door panel. The screen of **Phone 2** was left on and contained a text message link for tracking of a USPS package. A red Apple iPhone (hereafter referred to as **Phone 3**) was found on the floor of the front, passenger side seat. A black Samsung Galaxy cell phone, bearing International Mobile

Equipment Identifier (IMEI) 355070810723001 (hereafter referred to as **Phone 4**) and contained within its original box was found in the rear passenger side area of Vehicle 1. Agents also found a USPS purchase receipt from the Whitehall USPS located at 3750 East Broad Street, Columbus, OH 43213. The purchase was made on January 27, 2022, which was one day prior to LEWIS' arrival in St. Thomas, USVI. The purchase was for seven (7) 12.5 X 19 mailer envelopes. The cocaine seized from the USPS parcels was originally concealed with mailer envelopes matching the description of those on the receipt. Additionally, the mailer envelopes had cancellation stamps on the barcode to indicate they were purchased at the Whitehall, Ohio Post Office. USPIS is requesting the video from the Whitehall Post Office to document the purchase. Additional documents, mail and receipts were seized, along with several single dosed red and yellow pills in individual small clear plastic baggies.

23. **Phone 3** is currently in the custody of Homeland Security Investigations (HSI) Columbus, Ohio, which is within the Southern District of Ohio. Based on training and experience, your affiant knows **Phone 3** was stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when **Phone 3** first came into law enforcement's possession.

24. Probable cause exists to believe that **Phone 3** may contain evidence identifying: (1) cellular telephone numbers used by drug trafficking associates; (2) telephone calls conducted with drug trafficking co-conspirators (including time, date, and duration of calls); (3) photographs of and/or with drug trafficking co-conspirators, illegal controlled substances, and/or currency; (4) text and/or voicemail message communications (including time and date) with drug trafficking associates; (5) electronic mail and social media internet sites accessed by the users of the devices;

10

(6) usernames and/or passwords utilized by the users of the devices to access electronic mail and social media internet sites; and (7) addresses, locations, and locations frequented by **Phone 3**.

25. Based on your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that drug trafficking organizations utilize cellular telephones (such as **Phone 3**) to communicate when conducting their illegal activity, utilizing the voice, text, and electronic mail (if accessible) functions of the cellular telephone to do so. These devices are utilized in furtherance of the crime by coordinating the transport and distribution of controlled substances, the tracking of narcotics laden mail parcels, the collection and movement of currency, as well as communicating with members of the drug trafficking organization about the specific operations of that organization.

26. Further, based on your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that individual members of drug trafficking organizations often carry and utilize more than one cell phone per person at a time. It is common practice for these individuals to use different phones or various phone applications to communicate with different members of the drug organization. This helps insulate individuals from being linked to the greater conspiracy if one member is caught by law enforcement. Additionally, when communicating with drug trafficking organizations based in Mexico, it is common to see phones or SIM cards that are solely used to communicate with the individuals in Mexico, and phones or SIM cards solely used to communicate with individuals in the United States.

## TECHNICAL TERMS

27. Based on training and experience, your affiant uses the following technical terms to convey the following meanings:

11

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

28. Based on your affiant's training, experience, and research, your affiant knows that **Phone 3** has capabilities that allows it to serve as a wireless telephone, digital camera, and GPS navigation device. In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, items that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Phone 3** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Phone 3** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of **Phone 3** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

31. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

32. Your affiant submits that this affidavit establishes probable cause for a search warrant authorizing the examination of **Phone 3** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Clark Powers*

Clark S. Powers
Special Agent
Homeland Security Investigations

15

Subscribed and sworn to before me
on February 8/9, 2022:

*[signature]*

Elizabeth A. Preston Deavers
UNITED STATES MAGISTRATE JUDGE